**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**FALON V. NOBLE**

Plaintiff,

v.

**MAXIM HEALTHCARE SERVICES, INC.**

Defendant.

Civ. No. 12-cv-02227 (DRD)

**O P I N I O N**

THE TARQUINI FIRM, LLC
Dana L. Tarquini, Esq.
104 Woodlake Drive
Marlton, NJ 08053

*Attorney for Plaintiff,*

LITTLER MENDELSON, P.C.
Ivan R. Novich, Esq.
One Newark Center
8th Floor
Newark, NJ 07102

*Attorney for Defendant.*

**DEBEVOISE, Senior District Judge**

This case arises out of the alleged workplace discrimination of plaintiff Falon V. Noble while employed by defendant Maxim Healthcare Services, Inc. (“Maxim”). Ms. Noble, an African American woman, alleges that she was a victim of discrimination, harassment, and unequal pay in the workplace, culminating in her retaliatory termination by her supervisor Ed Hughes.

Currently before the Court is Maxim's motion to dismiss counts two, three, four, and six, for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Maxim further contends with respect to counts three and six, that Ms. Noble failed to exhaust her administrative remedies insofar as her harassment claim is predicated on federal law and to the extent that her Civil Rights Act claim is based on allegations of discrimination that occurred prior to her discharge. For the reasons set forth below, the motion to dismiss counts two, three, four, and six is GRANTED.

## I.   BACKGROUND

For purposes of this motion, the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

Ms. Noble is an African American woman formerly employed by Maxim as a recruiter, under the supervision and management of Mr. Hughes in the Jersey City office. Maxim is a Maryland Corporation doing business in New Jersey through its twelve statewide locations. Maxim supplies medical staff personnel to hospitals and medical facilities run by local, state, and federal governments as well as private facilities.

On September 7, 2010, Ms. Noble was hired by Maxim Staffing Solutions as a recruiter in the Jersey City office. Ms. Noble remained employed at Maxim until March 11, 2011 when she was terminated by Mr. Hughes. In January 2011, midway through her six-month tenure, Ms. Noble received a review stating that her attitude was one of her strengths and her performance was fine.

Maxim had five employees at its Jersey City office, of which three were recruiters. The recruiters were David Neu, a white man; Randall Dammers, a white man; and Ms. Noble, an

African American woman. When Mr. Neu was promoted and relocated, he was replaced by Joe Leonard, also a white man. The fifth employee of Maxim's Jersey City office was Denise Smith, a white woman, who was the site's compliance assistant. Mr. Hughes, the supervisor and manager of the office, is a white man. Thus, Ms. Noble was the only African American, and one of two women, working at the Jersey City office.

Discrepancy in travel expenses and pay

On the day that Ms. Noble was hired, Mr. Hughes informed her that he would look into having her daily commuting costs for two trains subsidized by the company. Maxim paid $200 in travel expenses to white male employees to cover parking costs, and $150 to Ms. Smith for parking costs. However despite many conversations regarding her transportation costs, Ms. Noble was never paid or reimbursed for her expenses.

Ms. Noble further alleges that Maxim paid varied compensation to employees of different sexes, and to recruiters of different races. The recruiters performed substantially the same work, in jobs requiring equal skills, effort and responsibility, and under the same work conditions.

Workplace environment

Ms. Noble purports that Maxim permitted and encouraged an anti-female and anti-minority workplace environment. The Complaint further alleges that Maxim's employees, including management personnel at the Jersey City facility, frequently referred to women as bitches. Additionally, Mr. Hughes announced to the entire office that women were crazy after he lost a business deal with a company that was owned by a woman. Moreover, in 2010, after interviewing a woman for a recruiter position, Mr. Hughes informed Ms. Noble that he did not want two women recruiters in his office because female nurse candidates would take orders

better from a male recruiter's voice than a female recruiter's voice. Last, Maxim permitted employees to refer to their minority candidates for replacement as idiots and as being stupid.

Verbal altercation leading to termination

On February 25, 2011, Ms. Noble was involved in a dispute with and caused by Ms. Smith regarding a placement referral file because the office had failed an audit. The yelling began in Ms. Smith's office and continued into the open area of the office referred to as the "pit." Mr. Hughes was not in the office that day. When he returned to the office on March 1, 2011, Ms. Noble asked to speak with him regarding the incident. Mr. Hughes replied that he would speak to both parties individually that afternoon. Mr. Hughes then spoke with Ms. Smith in the afternoon for over an hour, and with Ms. Noble after 5 p.m.

Mr. Hughes relayed to Ms. Noble that Ms. Smith had admitted that she yelled at her, and that she had no right to yell at fellow employees. Mr. Hughes never indicated that Ms. Noble was in the wrong, and acknowledged that Ms. Smith had behaved poorly in the past with Ms. Noble and Mr. Dammers. Ms. Noble requested a conference with Mr. Hughes and Ms. Smith to discuss and resolve the matter. Mr. Hughes stated that he would discuss the proposal with Ms. Smith. At the end of the conversation, Mr. Hughes handed Ms. Noble a write-up indicating that she had not made enough phone calls on days starting from the date of the dispute with Ms. Smith. Ms. Noble believes that she would not have been written-up for performance but for her complaint about Ms. Smith's behavior. Ms. Noble improved her performance in response to the write-up.

The next day, March 2, 2011, Ms. Noble again emailed Mr. Hughes to follow up on her request for a conference. Mr. Hughes stated that he had written-up Ms. Smith for her behavior on February 25, 2011, and that he had contacted Human Resources about the incident and would

follow up with Ms. Noble after Human Resources reviewed the matter. Mr. Hughes never again mentioned a Human Resources report to Ms. Noble. After the conversation with Mr. Hughes, Mr. Hughes was unfriendly toward Ms. Noble and began to avoid her.

On March 4, 2011, Ms. Noble noticed that an individual was at the office being interviewed for a recruiter position even though at the time, the Jersey City office did not have an opening for another recruiter. On March 10, 2011, Mr. Hughes sent an unflattering email to Maxim's three recruiters, which subsequently upset them and lead to some venting among the recruiters.

On March 11, 2011, Mr. Hughes informed Ms. Noble that she was terminated for having an outburst in the office, her attitude, and her performance.

The Equal Employment Opportunity Commission ("EEOC") Charge

After her termination, Ms. Noble contacted EEOC by phone and received a four page Intake Questionnaire in the mail. Ms. Noble completed the questionnaire and typed a six-page description of her grievances to the EEOC. She brought the questionnaire and the typed notes to the Newark EEOC office for an appointment on April 6, 2011 to discuss her complaints. On May 3, 2011, Ms. Noble received a letter from EEOC Investigator R. Wilson and a pre-filled EEOC Charge of Discrimination form in the mail. Ms. Noble did not write or complete the charge form herself. The description provides as follows:

> I was first hired by the above named employer on or about September 7, 2010. My most recent position was of a recruiter.
>
> I have been subjected to discrimination based on my race and sex. I was informed on March 11, 2011 I was being terminated based on false and unfounded allegations.

> Given the above I believe I have discriminated against based on my race and sex in violation of Title VII of the Civil Rights Act of 1964, as amended.
>
> (Def.'s MTD Br., Ex. A.)

Additionally, the prefilled form indicates by check-boxes that the discrimination is based on race and sex, and is not based on color, religion, national origin, retaliation, age, disability, genetic information, or other. The date of the discrimination is indicated as beginning and ending on March 11, 2011. The charge is not designated as a continuing action.

Ms. Noble opted to dual-file the Title VII charge of discrimination as a violation of the New Jersey Law Against Discrimination, N.J.S.A § 10:5-1, et seq., with the New Jersey Division on Civil Rights ("NJDRC") pursuant to a work-sharing agreement between the NJDRC and the EEOC.

On May 10, 2011, Ms. Noble signed the form before a notary and mailed it with the six-page addendum to the EEOC as directed. On May 13, 2011, she received confirmation that the charge was received. On December 23, 2011, Ms. Noble requested a notice of a right to sue, which was granted.

The underlying action

On April 13, 2012, the underlying action was removed from the Superior Court of New Jersey, Hudson Vicinage, to federal court based on federal question jurisdiction. The Complaint asserts claims for sex and race-based discrimination and retaliation in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 to -49 (counts one and two); harassment constituting a hostile work environment (count three) (statute not specified); unequal pay and compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 8 § 201,

et. seq. (count four) (not pursued)[1] and the Equal Pay Act of 1963 ("EPA") (count five); and intentional discrimination in breach of the Civil Rights Act of 1991 ("CRA") (count six). Ms. Noble demands a jury trial and compensatory and punitive damages, attorney fees, costs of suit, and an award of $300,000 pursuant to the CRA claim.

The pleadings only include a copy of the EEOC charge. (Novich Decl., Ex. A, Doc. 6-2; Noble Cert., Ex. A, Doc. 9-1.)

Maxim now moves for partial dismissal of counts two, three, and four, and count six of the Complaint, pursuant to Fed. R. Civ. P. 12(b) (6) for failure to state a claim upon which relief can be granted. Maxim argues that the Complaint fails to allege sufficient factual allegations to establish plausible claims concerning Ms. Noble's discrimination, retaliation, harassment, and unequal pay and compensation. Maxim further contends with respect to counts three and six, that Ms. Noble failed to exhaust her administrative remedies insofar as her harassment claim is predicated on federal law and to the extent that her CRA claim is based on allegations of discrimination that occurred prior to her discharge.

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss is reviewed pursuant to Federal Rule of Civil Procedure 12(b) (6), which provides for dismissal of a claim for failure to state a claim upon which relief can be granted. When considering a Rule 12(b) (6) motion, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The Court's inquiry,

---

1 Ms. Noble is no longer pursuing her FLSA claim (count four), conceding that it has been properly pled in her EPA and CRA claims in counts five and six.

however, "is not whether the plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the Rule 12(b) (6) standard in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007). The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, Twombly held that "[f]actual allegations must be enough to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." 550 U.S. at 545, 570. The plaintiff must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation."). This "plausibility" determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (internal citations omitted).

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949. Thus, the

Twombly Court stated that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (internal citations omitted). Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S.Ct. at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

A district court deciding a motion to dismiss generally does not consider material beyond the pleadings. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); Pension Benefit Guar. Corp. v. White Consol. Industries, 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied, 510 U.S. 1042 (1994). Typically, when a court does rely on matters outside of the pleadings, it must convert the motion to dismiss into a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and provide all parties with a reasonable opportunity to present all material pertinent to the motion. See Fed. R. Civ. P. 12(d). This rule allows the plaintiff an opportunity to respond to any extraneous documents that the court considers. Pension Benefit, 998 F.2d at 1196. An exception to the general rule exists, however, so that a court may consider extraneous documents to which a plaintiff refers in the complaint or on which he claims in the complaint were based without converting the motion to dismiss into one for summary judgment. Burlington Coat Factory, 114 F.3d at 1426; Pension Benefit, 998 F.2d at 1196. The rationale behind the exception is that, when a complaint refers to or relies on the document, "the plaintiff obviously is on notice of the contents of the document, and the need

for a chance to refute evidence in greatly diminished." Pension Benefit, 998 F.2d 1192 at 1196-97.

In the instant case, Maxim attaches the Equal Employment Opportunity Commission Administrative Charge as an exhibit to its Declaration in support of the motion to dismiss. (Novich Decl., Ex. A, Doc. 6-2.) Ms. Noble specifically refers to the document in the Complaint, see Compl. ¶ 58, and also attaches it as an exhibit to her certification in opposition to the motion. (Noble Cert., Ex. A, Doc. 9-1.) Accordingly, the Court will consider the document and examine the issues under the standard of a motion to dismiss.

**B. Analysis**

In its motion to dismiss, Maxim requests that the Court dismiss the NJLAD Retaliation claim; the Title VII and NJLAD hostile work environment claims; the Fair Labor Standards Act claim for failure to pursue; and the Civil Rights Act claim. The Court will address each claim separately.

**1. NJLAD Retaliation Claim (Count Two)**

At issue is whether Ms. Noble engaged in a protected activity under NJLAD when she complained to her supervisor of a co-employee's mistreatment, requested that a meeting be held between the three to mediate and resolve the matter, and made repeated requests for compensation for travel costs.

NJLAD prohibits "an employer, because of [ ] race . . . [or] sex . . . to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . ." N.J.S.A. § 10:5-12(a). A *prima facie* case of retaliation under NJLAD requires a plaintiff to show that (1) the employee engaged in a

protected activity; (2) the employer took an adverse employment action after or contemporaneously with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. See e.g., Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 286 (3d Cir. 2001).

The section of NJLAD regarding retaliation and reprisal provides in full as follows:

> [It is unlawful] [f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.
>
> N.J.S.A. § 10:5-12(d)

Ms. Noble argues that she was engaged in a protected activity when she was terminated after having reported and attempted to resolve the dispute with and caused by Ms. Smith, a white female co-worker. Additionally, Ms. Noble argues that she was unlawfully terminated due to her repeated requests for compensation for travel costs. Ms. Noble takes care to describe the racial and gender composition of all five of her co-workers. However of note here, Ms. Noble did not complain to Mr. Hughes that Ms. Smith mistreated her due to her race or sex. Nor did Ms. Noble complain that she was not compensated for travel expenses due to her race or sex.

Ms. Noble relies on Abramson, 260 F.3d at 286, to support the proposition that she engaged in protected activity because a formal written complaint is not necessary. However, the formality of Ms. Noble's complaints is not at issue. The issue here is whether Ms. Noble "opposed any practices or acts forbidden under this act," N.J.S.A. § 10:5-12(d), or in other words whether she engaged in a protected activity. The nature of Ms. Noble's complaints is

distinguishable from that deemed protected in Abramson, where the plaintiff specifically and repeatedly complained of discrimination exacted upon her due to her status as an Orthodox Jew. See 260 F.3d at 286. None of Ms. Noble's complaints or actions was premised on discriminatory conduct prohibited by NJLAD, nor was her termination the result of any protected conduct. Accordingly, count two is dismissed for failure to state a claim for which relief can be granted.

**2. Hostile Work Environment Claim (Count Three)**

Ms. Noble does not specify whether she raises her hostile work environment claim pursuant to Title VII or NJLAD. The Court assumes the claim is raised under both statutes, based on her option to dual-file the EEOC charge with the NJDCR, and the similarities of the procedural requirements and work-sharing agreements between the NJDCR and the EEOC for such claims.

The parties contest 1) the sufficiency of the alleged conduct in pleading a *prima facie* state law claim, and 2) whether administrative remedies were properly exhausted on the federal claim. The threshold issue is whether the hostile work environment claim is within the scope of the administrative charge or the ensuing investigation such that the EEOC was put on notice of the claim.

A plaintiff bringing an employment discrimination claim under Title VII must comply with the procedural requirements set forth in 42 § U.S.C. 2000e-5. Before filing a lawsuit, a plaintiff must exhaust administrative remedies by filing a timely discrimination charge with the EEOC. Id. §§ 2000e-5(b), (e)(1), (f)(1). The EEOC will then investigate the charge, and the plaintiff must wait until the EEOC issues a right-to-sue letter before she can initiate a private action. Burgh v. Borough Council, 251 F.3d 465, 470 (3d Cir. 2011). The ensuing suit is limited

to claims that are within the scope of the initial administrative charge. Antol v. Perry, 82 F .3d 1291, 1296 (3d Cir. 1996)); accord Barzanty v. Verizon Pa., Inc., 361 F. App'x 411, 414 (3d Cir. 2010). “The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court.” Antol, 82 F.3d at 1296.

To determine the scope of the charge, a court must consider the extent of the investigation that "can reasonably be expected to grow out of the [EEOC] charges.” Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978) (quoting Ostapowicz V. Johnson Bronze Co., 541 F.2d 394, 398-399 (3d Cir. 1976)); Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984) ("[A] district court may assume jurisdiction over additional charges if they are reasonably within the scope of the complainant's original charges."). Although this standard does not necessarily preclude a plaintiff from asserting a claim for a mere failure to check a box on an EEOC Charge of Discrimination Form, it prevents a plaintiff from "greatly expand[ing] an investigation simply by alleging new and different facts” when later bringing claims in the district court. Hicks, 572 F.2d at 967. “Because the aim of the statutory scheme is to resolve disputes by informal conciliation, prior to litigation, suits in the district court are limited to matters of which the EEOC has had notice and a chance, if appropriate, to settle.” v. New York Times Co., 200 F.3d 73, 93 (3d Cir. 1999) (citing Ostapowicz, 541 F.3d at 398).

In Anjelino, the Third Circuit Court of Appeals reversed the dismissal of a hostile work environment claim based on sexual harassment, where the EEOC charge listed that the plaintiffs were subjected to an “abusive atmosphere” because of sex. Id. at 92 - 96. The District Court for the District of New Jersey found that the EEOC was not properly notified of the claim because the charges were too vague. However, the Court of Appeals disagreed, finding that the terms

"abusive," "hostile," "environment," and "atmosphere" have been used interchangeably to describe such claims. Id. The Court of Appeals also reversed the decision in Howze and provided leave to amend a complaint to add a retaliation claim where the original EEOC charge listed only racial discrimination. 750 F.2d at 1212. The Court of Appeals reasoned therein that because the discrimination and retaliation claims were alternative allegations regarding the employer's failure to promote a plaintiff, and because the facts supporting the new allegation were the same as the prior claim, the agency was sufficiently notified of the claim. Id.

The facts in the instant case are similar to those in Barzanty, where the EEOC charge listed only an allegation of gender discrimination related to termination, but the plaintiff introduces a new hostile work environment claim in court. 361 F. App'x at 411. The Court of Appeals found that where the two claims related to separate occurrences – one distinct to termination on a particular date, the other to continuing occurrences unrelated to the discharge – administrative remedies were not sufficiently exhausted. Id. at 414.

Here, the EEOC charge does not mention a hostile work environment or harassment. The charge only alleges race and sex-based discrimination beginning and ending on March 11, 2011, the day of the termination, without any factual exposition. Additionally, the charge is not indicated as a continuing action.

Ms. Noble now asserts that she was subjected to a hostile workplace environment by the making and permitting of anti-female statements and the disparagement of women and minorities, in full view and hearing of the employees in the workplace. Specifically, Ms. Noble alleges:

> 48. Defendant's employees, including management personnel at the Jersey City facility, frequently referred to women as bitches.

> 49. Plaintiff avers that Hughes announced to the entire office that women were crazy after he lost a business deal with a company that was owned by a woman.
>
> 50. In 2010, after interviewing a woman for a recruiter position, Hughes informed plaintiff that he did not want two women recruiters in his office because female nurse candidates would take orders better from a male recruiter's voice than a female recruiter's voice.
>
> 51. Plaintiff avers that defendant permitted employees to refer to their minority candidates for placement as idiots and as being stupid.
>
> (Compl. ¶¶ 48 – 51.)

Ms. Noble certifies that she included a six-page addendum to the EEOC charge from further detailing the conduct challenged. The addendum allegedly informed the EEOC in describing the particulars of the charge. Ms. Noble claims that the EEOC failed to properly describe her charge after having reviewed the four-page Intake Questionnaire and the six-page addendum. However, none of these documents are submitted on the record. Ms. Noble fails to respond to Maxim's challenge of her lack of exhaustion of administrative remedies altogether, and relies solely on the sufficiency to establish the elements of the claim.

The attempt to rake in this new claim must be barred because it is clearly outside the scope of the charge. The new attempted claim includes incidents predating the date specifically challenged on the form, and is wholly distinct from the discrimination-related allegations listed. See Barzanty, *supra* at 14. Moreover, any engagement by the Court into what notification the EEOC received beyond the EEOC charge would be an exercise in speculation prohibited at this stage of review.

The parties further disagree as to whether Ms. Noble sufficiently plead the elements of the related state law claim. However, the Third Circuit Court of Appeals informs that the foregoing analysis of the failure to exhaust administrative remedies on the federal claim also applies to the parallel NJLAD claim. See Angelino, 200 F.3d at 95. "This result is suggested by the similarities between the procedural requirements of Title VII and NJLAD, and the work-sharing agreement between the two agencies pursuant to which the NJDCR deferred handling of the NJLAD claims to the EEOC." Id. (citing 29 C.F.R. §§ 1601.13(a) (4) (ii), 1626.10(c) (describing work-sharing agreements between EEOC and state agencies); 29 C.F.R. §§ 1601.70 – .71 (describing deferral process)).

The hostile work environment federal and state law claims are therefore dismissed because the Court cannot draw a reasonable inference that Maxim is liable for the conduct alleged. Count three is dismissed for failure to state a claim upon which relief may be granted.

**3. Fair Labor Standards Act Claim (Count Four)**

Ms. Noble does not pursue her FLSA claim because it is unnecessarily duplicative and properly pled as an Equal Pay Act claim (count five) and a Civil Rights Act claim (count six). Therefore, the FLSA claim, count four, is dismissed.

**4. Civil Rights Act Claim (Count six)**

Like the hostile work environment claim discussed above, the CRA claim is challenged for failure to exhaust administrative remedies. Maxim argues that Ms. Noble failed to properly exhaust her administrative remedies to the extent that the alleged intentional discrimination predates and therefore goes beyond the scope of the EEOC charge.

Ms. Noble concedes that the "EEOC charge is not artfully drafted," but argues that "it was not drafted by plaintiff and cannot be held against her." (Pl.'s Opp. Br. at 9.) Ms. Noble

explains that the form "was mailed to her to sign as a summary of her complaints that were expressed to an EEOC investigator during an interview and from an intake questionnaire and a written statement prepared for the EEOC." Id. Ms. Noble contends that as a "lay person in regard to legal matters, plaintiff was not knowledgeable enough to know that the EEOC matter would be of question in litigation beyond her EEOC complaint or that the defendant in such future litigation would attempt to limit the discussion to the words chosen by the EEOC. Nor did she imagine that the investigation by the EEOC, to whom she gave a full account during an interview and in writing, be limited in the way that the defendant describes." Id.

Ms. Noble further argues the charge, *supra* at 5, should be read as two parts, the first reporting discrimination in general, and the second specific to termination. Ms. Noble contends that the two sentences can be interpreted as not being limited to the incident of the termination, and suggests a reading extracting from the prior paragraph that could suggest discrimination since the start of employment.

The general theme of Ms. Noble's complaint is that the Court should not rely on the EEOC charge because it was inaccurately prefilled by the agency after having reviewed a six-page addendum to the form and a four-page Intake Questionnaire, and after having conducted an interview. While the Court is sympathetic of individuals who are not proficient in legalese, the EEOC complaint process has a specific purpose to encourage alternative dispute resolution via notification to avoid unnecessary action in court. Ms. Noble urges the Court that an examination of the facts, with all reasonable inferences taken in the light most favorable to the defendant, requires a reading of the charge's description in full, rather than a narrowing on the provision related to her termination. However even so doing, the full description only yields conclusory legal allegations rather than a proper factual description of the charges alleged; does not describe

the charge as an ongoing action; and limits the dates at issue to the day of the termination, March 11, 2011. Perhaps in anticipation to this finding, Ms. Noble further vies that the Court should rely on matters which are not attached to the record, without citing any supporting case law to justify such protracted speculation. Although the Court does not wish to sacrifice form over function and exalt the EEOC charge form as an inflexible object, the factual allegations here still fail to rise above the speculative level. Count six is therefore dismissed to the extent that the alleged Civil Rights Act violation predates the date of termination.

## III. CONCLUSION

For the aforementioned reasons, the motion to dismiss is GRANTED with respect to counts two, three, and four. The motion is granted with respect to count six, to the extent that the challenge predates March 11, 2011. Counts one and five of the Complaint are still outstanding. An Order will be issued in accordance with this opinion.

**/s/Dickinson R. Debevoise**
**DICKINSON R. DEBEVOISE, U.S.S.D.J.**

Dated: July 24, 2012